## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

**CASE NO.**   1:21mj03637 Becerra

UNITED STATES OF AMERICA

v.

GUSTAVO GERALDES,
            Defendant.            /

### CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?

Respectfully submitted,

JUAN ANTONIO GONZALEZ
ACTING UNITED STATES ATTORNEY

JOSEPH S. BEEMSTERBOER ACTING
CHIEF, FRAUD SECTION CRIMINAL
DIVISION DEPARTMENT OF JUSTICE

BY:    /s/ Ligia Markman
Ligia Markman
DOJ Trial Attorney
Court ID No: A5502656
1400 New York Avenue
Washington, DC 20005
TEL: 202-794-2219
Email: Ligia.Markman@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| GUSTAVO GERALDES | ) | Case No.   1:21mj03637 Becerra |
| | ) | |
| | ) | |
| | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___March 2019 through March 2021___ in the county of _____Miami-Dade_____ in the
____Southern____ District of _____Florida_____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy to defraud the United States |
| 18 U.S.C. § 1001 | False Statements |

This criminal complaint is based on these facts:

See attached affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent Victoria Buono; HHS-OIG
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by  Telephone.

Date:  ___08/18/2021___

_____
*Judge's signature*

City and state: _____Miami, Florida_____

Hon. Jacqueline Becerra, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Special Agent Victoria Buono, being duly sworn, do hereby and depose and state:

### Introduction

1.      I make this affidavit in support of a criminal complaint charging Gustavo Geraldes ("GERALDES") with conspiracy to defraud the United States and to offer and pay kickbacks in violation of 18 U.S.C. § 371, and false statements in violation of 18 U.S.C. §1001.

2.      I am a Special Agent with the U.S. Department of Health and Human Services, Office of Inspector General's Office of Investigations (HHS-OIG/OI).  I have been employed in this capacity for approximately 2 years.  I am presently assigned to investigate a wide variety of health care fraud matters, including schemes to defraud Medicare and Medicaid.  In this capacity, I am authorized to conduct investigations into criminal violations committed against the United States, including, but not limited to health care fraud, payment and receipt of illegal health care kickbacks, making false statements in connection with a health care benefit program, and related conspiracies.  I am authorized to apply for and execute arrest warrants for offenses enumerated in Titles 18 and 42 of the United States Code, and to execute search warrants.  Prior to my law enforcement career, I was employed as a program analyst for the U.S. Department of Homeland Security, Office of Inspector General.  I have received training in investigating various types of criminal activity, including fraud, at the Federal Law Enforcement Training Center in Brunswick, Georgia and the HHS-OIG/OI training center in Largo, Maryland.

3.      I am personally involved in conducting a joint investigation with other federal agencies into alleged criminal activities perpetrated by GERALDES, former owner of Panda Conservation Group, LLC ("Panda") as well as several of his associates. The information

contained in this Affidavit is based upon a review of public and private records, interviews, and other investigative activities conducted by law enforcement personnel assigned to this case.

4.    In connection with this scheme at Panda, on May 25, 2021, a grand jury in the Southern District of Florida indicted Michael Stein and Leonel Palatnik on one count of conspiracy to defraud the United States and offering and paying and soliciting and receiving, kickbacks, in violation of Title 18, United States Code, Section 371.   Stein was charged with four additional counts of solicitation and receipt of kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b)(1)(B), and Palatnik was charged with four additional counts of offering and paying kickbacks, in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B).   *United States v. Stein et al.*, No. 21-cr-020321 (S.D. Fla. May 25, 2021).

5.    Because this Affidavit is provided for the limited purpose of establishing probable cause for an arrest, I have not included all information known to me regarding this investigation, but rather have set forth only those facts necessary to establish probable cause to believe that the defendant has committed the charged offenses.

### The Charged Offenses

6.    Title 18, United States Code, Section 371 provides that it is a criminal offense "[i]f two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose."

7.    Title 18, United States Code, Section 1001 provides that it is a criminal offense to, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government, to falsify, conceal, or cover up by any trick, scheme, or device a material fact, or to make any materially false, fictitious or fraudulent statement or representation.

### The Defendant and His Entities

8.      GERALDES is a resident of Miami-Dade County, Florida.  Based on corporate agreements obtained from Panda and GERALDES during the course of this investigation, GERALDES indirectly owned 30.08% of Panda through his corporate entity, Drip Management, LLC ("Drip").  GERALDES also owned Milkit, LLC ("Milkit"), a marketing company contracted to provide marketing services to Panda.  Milkit handled the creation and management of online tools used by Panda to identify Medicare beneficiaries interested in genetic testing services. Delaware Department of State records show Drip was incorporated in Delaware, however, no owner is listed.  Records filed with the Nevada Secretary of State, where Milkit is incorporated, show GERALDES to be the sole manager.

9.      Panda Conservation Group, LLC was a company organized and existing under the laws of Texas, with a mailing address located at 440 South Federal Highway, Suite 207, Deerfield Beach, FL 33441.  Panda owned multiple laboratories engaging in cancer and cardiac genetic testing, including Amerihealth Laboratory, LLC, and MP3 Labs, Inc. (collectively, the "Laboratories").  To market its services, Panda used a call center operating under the name "Health Awareness Project," or "HAP," located at 6451 North Federal Highway, Suite 1003, Fort Lauderdale, FL 33308.  In addition to GERALDES, Panda was owned by several entities and individuals, which are described in further detail below.

10.     Amerihealth Laboratory, LLC ("Amerihealth") is a laboratory located at 4225 Office Parkway, Suite 110, Dallas, TX 75204.  According to its website, it offered respiratory pathogen panels, urinary tract infection tests, and toxicology testing to the public.  Medicare billing data and interviews with witnesses show they also offer genetic testing services.  Records on file with the Florida Secretary of State listed Panda as Amerihealth's manager.  Medicare records listed

Leonel Palatnik as Amerihealth's sole director/officer, partner, authorized official, and owner from in or around May 2019 until in or around January 2021; however, corporate agreements obtained from Panda during the course of this investigation list Panda as the 100% owner of Amerihealth as of June 25, 2019.   Between April 1 and December 31, 2020 Amerihealth submitted approximately $68 million in genetic testing claims to Medicare, of which Medicare paid approximately $46.5 million.

11.     MP3 Labs, Inc. ("MP3") is a laboratory located at 1500 I-35 W, Suite 120, Denton, Texas 76207.  According to its website, it offered genetic, toxicology, and blood wellness testing to the public. Medicare records list Owner 1 as the sole owner, authorized official, and/or managing employee of MP3; however, corporate agreements obtained from Panda during the course of this investigation list Panda as the 100% owner of MP3 as of January 1, 2020.  Between April 1 and December 31, 2020, MP3 submitted approximately $22 million in claims to Medicare, of which Medicare paid approximately $14.7 million.

12.     Individual 1 is a resident of Dallas County, Texas.  Based on corporate agreements obtained from Panda during the course of this investigation, Individual 1 co-owned approximately 40% of Panda until on or around October 27, 2020.

13.     Individual 2, formerly a resident of Palm Beach County, Florida, has been out of the country since approximately late 2019.  Based on corporate records obtained during the course of this investigation, Individual 2 co-owned 24.67% of Panda.

14.     Leonel Palatnik is a resident of Palm Beach County, Florida.  Based on corporate agreements provided by Panda during the course of this investigation, Palatnik indirectly owned 5% of Panda.  From on or around May 15, 2019, until approximately January 1, 2021, Palatnik was also listed in Medicare enrollment records as the only owner of Amerihealth.

15.     Individual 3 is a resident of Dallas County, Texas.  Based on corporate agreements provided by Panda during the course of this investigation, Individual 3 purchased Individual 1's ownership interest in Panda on or around October 27, 2020, and owned approximately 40% of Panda.

16.     Michael Stein is a resident of Palm Beach County, Florida.   According to documents filed with the Florida Secretary of State, Stein is the sole manager and registered agent for 1523 Holdings, LLC ("1523"), dba Inwerx, a Florida company located at 2000 N. 29th Ave. No. 301, Hollywood, FL 33020.  1523 purported to offer healthcare IT services, clinical trial recruitment, cloud solutions, digital marketing for healthcare providers, and other services.  On or around April 1, 2020, shortly after the start of the Covid-19 National Emergency, Panda entered into a contract with 1523 whereby 1523 would purportedly provide Panda with IT/software services, including video examination and consultation capability, and Panda would pay 1523 a monthly flat fee of $50,000.  Based on witness interviews, email correspondence, texts, and other evidence obtained from Panda during the course of this investigation, 1523 and Stein did not provide IT services to Panda.  Instead, in return for this monthly fee, 1523 provided Panda with access to a stable of telehealth providers willing to authorize orders for genetic testing at the Laboratories in exchange for access to patients recruited by Panda, and the ability to bill Medicare for telehealth visits with those patients.

17.     Growthlogix, LLC ("Growthlogix") was a Florida company located at 2000 N. 29th Ave. No. 301, Hollywood, FL 33020, the same address listed for 1523.  Records filed with the Florida Secretary of State listed Stein as the entity's registered agent.  These records also show that the entity's name was changed to "DIGITAL MAYO, LLC" in or around January 2018.

18.     NP1 is a Nurse Practitioner residing in Miami, Florida. Between approximately April and October 2020, NP1 billed Medicare approximately $822,000 for purported in-person patient office visits, of which Medicare paid around $467,000. In contrast, during all of 2019, NP1 billed Medicare only approximately $7,000, and was paid roughly $500. During the course of this investigation, law enforcement interviewed multiple beneficiaries who were billed by NP1 for in-office visits; they all reported they never had a consultation, in-person or via telemedicine, with NP1. NP1 was responsible for approving approximately the vast majority (more than 70%) of Amerihealth and MP3's genetic testing billings for 2020. NP1 was one of the telehealth providers who signed orders that 1523 referred to Panda and its laboratories.

### The Medicare Program

19.     The Medicare Program ("Medicare") is a federally funded program that provides free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The Centers for Medicare & Medicaid Services ("CMS") is responsible for the administration of the Medicare Program.

20.     Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Beneficiaries are eligible to receive a variety of services, including hospital services ("Part A"), physician services ("Part B"), and prescription drug coverage ("Part D"). Part B covers outpatient physician services, such as office visits, minor surgical procedures, and laboratory services, such as drug testing and genetic testing, when certain criteria are met.

21.     "Providers" include clinical laboratories, physicians, and other health care providers who provide services to beneficiaries. In order to bill Medicare, a provider must submit an enrollment application to Medicare. The enrollment application contains certification statements that the provider must agree to before enrolling with Medicare. Specifically, the

certification statement sets forth, in part, that the provider agrees to abide by the Medicare laws, regulations, and program instructions, including the federal Anti-Kickback Statute, and will not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare. The certification statement also states that the provider understands that any deliberate omission, misrepresentation, or falsification of any information contained in the application may be punished by criminal penalties.

22.      Medicare will not pay claims procured through the payment of kickbacks and bribes.

23.      A Medicare "provider number" is assigned to a provider upon approval of the provider's Medicare application.  A provider may use that provider number to file claims with, or "bill" Medicare to obtain reimbursement for services rendered to beneficiaries.  When submitting claims to Medicare for reimbursement, providers certify that: (1) the contents of the forms are true, correct, and complete; (2) the forms are prepared in compliance with the laws and regulations governing Medicare; and (3) the services purportedly provided, as set forth in the claims, are medically necessary.

24.      Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B.  The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries.  The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

25.      This investigation concerns claims submitted to Medicare for Part B laboratory services, namely, cancer and cardiac genetic testing.  These tests can indicate an increased risk of

developing certain cancers or cardiac conditions in the future and can help providers determine the appropriate course of treatment for a person diagnosed with these diseases. However, the tests do not detect existing conditions. Medicare reimburses for the test at rates varying from approximately a few hundred dollars to tens of thousands of dollars for a panel of tests.

26. Congress statutorily excluded Medicare from covering diagnostic testing that was "not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "examinations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint or injury." 42 C.F.R. § 411.15(a)(1). Among the statutory exceptions Medicare covered were cancer screening tests such as "screening mammography, colorectal cancer screening tests, screening pelvic exams, [and] prostate cancer screening tests." *Id.*

27. If diagnostic testing were necessary for the diagnosis or treatment of illness or injury to improve the functioning of a malformed body member, Medicare imposed additional requirements before covering the testing. 42, Code of Federal Regulations, Section 410.32(a) provided "All diagnostic x-ray tests, diagnostic laboratory tests, and other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, the physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem." "Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary." *Id.*

28. As a condition of Medicare payment, a physician or other Medicare provider must certify that the services performed were medically necessary. 42 U.S.C. § 1395n(a)(2)(B).

29.     Because cancer and cardiac genetic testing did not diagnose cancer or cardiac conditions, Medicare only covered such tests in limited circumstances, such as when a beneficiary had cancer or a cardiac condition and the beneficiary's treating physician deemed such testing necessary for the beneficiary's treatment of that condition.  Medicare did not cover genetic testing for beneficiaries who did not have cancer or cardiac disease or lacked symptoms such diseases.

30.     Medicare requires ordering/referring physicians to document medical necessity and other coverage for genetic testing.  Medicare regulations required health care providers enrolled with Medicare to maintain complete and accurate patient medical records reflecting the medical assessment and diagnoses of their patients, as well as records documenting actual treatment of the patients to whom services were provided and for whom claims for payment were submitted by the physician.  Medicare required complete and accurate patient medical records so that Medicare may verify that the services were provided as described on the claim form.  These records were required to be sufficient to permit Medicare, through its contractors, to review the appropriateness of Medicare payments made to the health care provider.  Providers are required to maintain copies of these records for seven years and to make them available upon request.

31.     Telehealth services are only covered by Medicare if they are medically necessary and reasonable, provided as represented, and not procured by the payment of kickbacks and bribes.  In addition, Medicare traditionally required the following conditions be met prior to covering a telehealth service: (a) the beneficiary received the services at an originating site located in either a county outside a metropolitan statistical area or a rural health professional shortage area; (b) a qualified professional licensed in the State provided the covered telehealth service; (c) an interactive audio and video telecommunications system that permits real-time communication was used between the Medicare beneficiary at the originating site and the practitioner at the distant

site; and (d) the appropriate CPT and/or HCPCS codes for the telehealth services were submitted. 42 U.S.C. § 1395m; 42 C.F.R. § 410.78.

32.    On January 31, 2020, the Secretary of the Department of Health and Human Services declared that, in light of confirmed cases of the 2019 Novel Coronavirus ("COVID-19"), a public health emergency existed nationwide. On March 6, 2020, the Coronavirus Preparedness and Response Supplemental Appropriations Act was signed into law. H.R. 6074, Pub. L. 116-123. Among other directives, the Act allowed CMS to temporarily waive certain Medicare restrictions and requirements regarding telehealth services during the coronavirus public health emergency. Pursuant to the Act, CMS has issued new telehealth guidelines allowing beneficiaries to receive telehealth services in their place of residence, in all areas of the country, for the duration of the emergency. However, as with all Medicare services, telehealth services are only covered if they are medically necessary and reasonable, provided as represented, and not procured through the payment of kickbacks and bribes.

### The Defendant's Involvement in the Conspiracy

### Introduction

33.    Evidence obtained during the course of this investigation establishes that Panda used Facebook and other websites to market genetic testing kits aggressively to Medicare beneficiaries, without regard to whether beneficiaries have active cancer or cardiac disease diagnoses or symptoms of these illnesses that their treating physician has decided need to be treated. In order to bill insurers, including Medicare, for these genetic tests, GERALDES and his co-conspirators needed testing orders, or "doctor's orders" or "D.O.s," authorized by licensed medical professionals. According to witness interviews, bank records, emails, texts, and other documentary evidence obtained during the course of this investigation, starting in or around April

2020, GERALDES and his co-conspirators offered and paid illegal kickbacks and bribes to Stein, through his entity 1523, to arrange for medical professionals to order these tests. Panda's owners deliberately obscured the true purpose of the contract between the two companies to hide this conduct. The medical professionals provided by 1523 were not treating the beneficiaries for any specific medical problem, and, in some cases, do not actually perform the telehealth consultation with the beneficiaries, as is required by Medicare's rules and regulations.

34.     GERALDES and his co-conspirators understood the process by which Panda obtained test authorizations. Although GERALDES understood that the tests were not being ordered by a medical provider treating the beneficiaries, were not being used by the provider to treat specific medical problems, that the provider who ordered the tests at times did not even speak to the beneficiary, and that the beneficiaries did not always have cancer or cardiac disease or symptoms of these illnesses that needed to be treated, Panda's laboratories submitted tens of millions dollars in claims for these tests.

35.     During the course of this investigation, law enforcement has obtained statements from witnesses and cooperators, Medicare data, Medicare enrollment documents, corporate agreements, documentary evidence, financial records, and electronic communications that establish probable cause to believe GERALDES committed the charged offenses.

### Witness Interviews

36.     During interviews in June and August of 2021, Cooperating Witness 1, who has signed a plea agreement pleading to one count of conspiracy to defraud the United States in violation of Title 18, United States Code, Section 371, and one count of paying kickbacks in violation of Title 42, United States Code, Section 1320a-7b(b)(2)(B) in connection with this investigation, and is cooperating in the hopes of obtaining a lower sentence, told law enforcement

that he and the other Panda owners agreed to falsely represent to Medicare that Palatnik was the only owner, as reflected on the Medicare enrollment paperwork, as all the other owners, including GERALDES, had legal issues in their past that could preclude Medicare from approving the enrollment of the Laboratories in Medicare.

37.     Cooperating Witness 1 represented to law enforcement that Panda's owners, including GERALDES, agreed to pay Stein, through his company 1523, a $50,000 monthly kickback or bribe in exchange for Stein arranging for telemedicine providers to authorize genetic testing orders for Panda's laboratories. Cooperating Witness 1 stated that the owners understood that this arrangement was illegal, and entered into a sham contract for purported IT and consultation services in order to disguise the true purpose of the payments. Cooperating Witness 1 stated that Panda's owners knew that these telemedicine providers had no pre-existing relationship with the Panda-recruited patients, typically did not actually speak to the patients prior to authorizing testing, and would not have ben able to access these patients and bill Medicare for visits with them if they did not agree to refer authorized genetic testing orders to the Laboratories.

38.     Cooperating Witness 1 has also told law enforcement that Panda's owners, including GERALDES, discussed that they could not pay providers to sign authorizations for the Laboratories without violating Anti-Kickback Statute, but nonetheless hired Stein to be an intermediary who could provide the telehealth professionals valuable patient referrals in exchange for their agreement to refer orders to the Laboratories, even though they knew that the Anti-Kickback Statute did not permit that. Cooperating Witness 1 stated that GERALDES was aware that the providers were receiving these referrals, and that GERALDES also understood that, in exchange, the providers were required to refer any testing they authorized for these patients back to the Laboratories. Cooperating Witness 1 also stated that GERALDES and the other Panda

owners all knew that these providers would obtain financial remuneration in exchange, by being able to bill Medicare for consultations with Panda-referred patients.

39.     In or around May 2021, law enforcement interviewed Stein pursuant to a proffer agreement.  During that interview, Stein acknowledged that he did not actually provide the IT-related services described in his contract with Panda, and that the payments he received under that contract were actually in exchange for his services arranging for telemedicine providers to authorize genetic testing orders for the Laboratories.

40.     In or around June 2021, law enforcement interviewed Technician 1, the Information Technology ("IT") Manager for Panda.  Technician 1 was hired by GERALDES, and handled all IT work for the company, including managing the company's customer relationship management ("CRM") portal, which was used by customer service representatives, healthcare providers, and laboratory employees to manage patient information, shipment of testing kits, and authorization of testing orders.  Technician 1 stated that Stein did not provide any IT services to Panda.

41.     In or around April 2021, law enforcement interviewed NP1 pursuant to a proffer agreement.  NP1 confirmed that he/she had no pre-existing relationship with the Panda patients for whom he/she authorized testing, was not their treating physician, did not diagnose or treat the patients for any illness, and would not have had access to those patients or been able to bill their consultations to Medicare had she not agreed to refer testing orders for those patients to the Laboratories.  NP1 stated that she often authorized tests without speaking to the patients, and that she never denied tests for any Panda patients.

42.     In or around April 2021, law enforcement interviewed Doctor 1 pursuant to a proffer agreement.  Doctor 1 was a healthcare provider who was recruited through Stein to authorize testing orders for the Laboratories.  Doctor 1 stated that he/she authorized approximately

200 D.O.s for the Laboratories, even though he/she was not the patient's treating physician and did not receive or use their test results for treatment or diagnosis. Doctor 1 stated that, although he/she never spoke to any of the patients for whom he/she approved testing, he/she expected to bill Medicare for consultations with them.

43.     Since mid-2020, law enforcement agents have interviewed more than 20 Medicare beneficiaries who received genetic test kits from Panda. Most of the beneficiaries told law enforcement that they requested genetic kits after seeing online advertisements from the "Health Awareness Project," the name used by Panda for its marketing efforts, promoting genetic screenings/testing. Several beneficiaries interviewed reported that the advertisements falsely suggested the tests would be "free," when in fact the investigation has revealed that the tests were billed for thousands of dollars to Medicare. Most beneficiaries reported that their tests were authorized by NP1, but that they had never met or spoken to NP1. None of the beneficiaries' primary care physicians ordered these tests, and, according to the beneficiaries, none of them used the results in connection with the beneficiaries' treatment. At least two beneficiaries who sent in their kits never received their results. Several of the beneficiaries were shocked to learn that Medicare was charged tens of thousands of dollars for these tests, and said they would not have taken the tests had they known the cost. As part of the investigation, agents uncovered information that beneficiaries made a litany of publicly available complaints regarding alleged fraud perpetrated by HAP on various review sites for HAP.

### Corporate and Medicare Enrollment Documents

44.     This investigation has also revealed that Panda and its owners concealed and disguised their ownership of the relevant laboratories from Medicare, in violation of CMS guidelines.

45.     As stated above, the Laboratories are owned by Panda and are enrolled as Medicare providers.  As such, each laboratory submitted a Medicare Enrollment Applications that required disclosure of all organizations or persons with 5 percent or more direct or indirect ownership in the Laboratories.  The Medicare Enrollment Application, also known as Form CMS-855B, states that "[c]hanges in your existing enrollment data must be reported . . . in accordance with 42 C.F.R. § 424.516," which requires organizations, like the Laboratories, to report changes of ownership within 30 days.  The Application also includes a Certification Statement, which states "I have read and understand that any deliberate omission, misrepresentation, or falsification of any information contained in this application or contained in any communication supplying information to Medicare . . . may be punished by criminal, civil, or administrative penalties including, but not limited to . . . imprisonment."

46.     Corporate agreements obtained from Panda during the course of this investigation list Panda as the sole owner of Amerihealth since at least June 2019, and the sole owner of MP3 since at least January 2020.

47.     On or around December 18, 2020, Individual 3, through his counsel, provided the government with a copy of an "Amended & Restated Company Agreement" for Panda dated January 1, 2020.  This agreement sets out the members of Panda, including GERALDES, Palatnik, and Individuals 1 and 2.

48.     On or around December 22, 2020, Panda, through its counsel, provided the government with a copy of an executed "Company Agreement" for Amerihealth, dated June 25, 2019, and signed by Individual 1 on behalf of Panda.  This agreement purports to set out the ownership and management of the laboratory, and lists Panda as the 100% owner of Amerihealth.

49.     The same day, Panda, through its counsel, provided the government with a copy of an executed "Company Agreement" for MP3, dated January 1, 2020, and signed by Individual 1 on behalf of Panda. This agreement purports to set out the ownership and management of the laboratory, and again lists Panda as the 100% owner of MP3.

50.     CMS guidelines require that changes in ownership or control for an enrolled Medicare provider must be reported to CMS within 30 days. However, neither Panda nor any of the entities and individuals that directly and indirectly owned Panda, such as GERALDES, were listed in the Laboratories' Medicare Enrollment Forms obtained during this investigation, with the exception of Palatnik (for Amerihealth) and Individual 3 (for Amerihealth, starting in January 2021). In this affiant's training and experience, Medicare would not have approved the enrollment application and the laboratories would not have been able to submit the claims if Medicare had been made aware that GERALDES and others failed to disclose their ownership and/or managing control on the enrollment application.

### Email and Text Evidence

51.     In or around February and March 2021, law enforcement executed search warrants for two email accounts used by Stein to conduct business. In addition, Panda voluntarily provided business email accounts for multiple company employees, including GERALDES. These emails and text messages show that GERALDES knew that Panda could not legally pay a telemedicine provider to arrange for the referral of patients. The emails and text messages also show that GERALDES knew that Stein was in fact being paid to provide telemedicine services to the company.

52.     On March 24, 2019, Individual 2 sent GERALDES and Palatnik a draft agreement between HAP and Growthlogix, which stated that Growthlogix would provide a "telemedicine

platform" for HAP.   This agreement was executed in 2019, but Stein only provided services pursuant to it for a few weeks because of legal concerns, which were discussed with GERALDES.

53.     In or around June 2021, Cooperating Witness 1 voluntarily provided the government with screenshots of text messages between GERALDES and others at Panda.  The messages show that on or about March 17, 2020, GERALDES wrote "we can't pay for the consultation with the doctor." On March 20, 2020, GERALDES wrote "Seems like we can milk TeleMed" and added that Palatnik "is reaching out to the telemedicine company we wanted to use last time. We are hoping we can get them onboard."

54.     On or around July 1, 2020, Panda and 1523 executed a contract, effective April 1, 2020, that stated that 1523 would provide IT services to Panda.  The contract did not mention telemedicine services.  In response to concerns that the contract referring to telemedicine services "would take it outside of the personal and management services contract safe harbor [of the Anti-Kickback Statute]" Stein wrote in an email to others at Panda that "I have changed 'Software Provider' to consultant and removed any references to telemed/doctors."

55.     Emails between GERALDES and Individual 1 show that GERALDES understood that in fact Stein would be providing telemedicine related services to Panda.  For instance, on April 29, 2020, GERALDES emailed Individual 1 with the subject "Growth Logix Contract Approval." The email shows that the approval is part of a "Telemed Launch" project.

56.     GERALDES also received training materials that Stein subsequently distributed to providers.  On April 7, 2020, Individual 2 sent GERALDES a document titled "Zoho CRM Teledoc Cheatsheet" that described each step providers would take in order to review patient files and authorize testing.  The document shows that providers would not be given an opportunity to select a laboratory of their choice when ordering testing, as the D.O.s were automatically populated

with the name of one of the Laboratories  The document also showed that providers would have to sign an attestation stating "I am the patient's treating physician and this order is based upon Medicare's requirement that the testing is not ordered for the purposes of screening but for the diagnosis and treatment of the patient's individual medical condition."  The document falsely stated that "The Health Awareness Project only prequalifies individuals who meet Medicare's guidelines" for genetic testing, and that "[i]n order to qualify for testing, the patient must have or had a personal history of" cancer or cardiovascular issues.  The training packet also included what appeared to be patient-facing marketing materials that stated that even patients who "had cancer" in the past and "have no current symptoms," in the case of CGx, or those who "have unexplained fainting," "chest pains," "problems with exercise," or a chronic illness, in the case of Cardio genetic tests, can qualify for these tests.  During his interview with law enforcement, Doctor 1 stated that Stein provided him/her with a copy of this training packet.

57.     In or around April 2020, GERALDES, who was in charge of the company's marketing efforts, received an email attaching a customer service call script instructing operators to tell patients that the cancer genetic tests performed by the Laboratories would "let you and your doctor know if anything is cancerous," even though these tests could not diagnose cancer.

### Financial Records

58.     Bank records obtained via grand jury subpoenas from JP Morgan Chase Bank, N.A. and Maple Mark Bank show multiple transfer from Panda accounts to 1523, totaling approximately $400,000, between April 2020 and November 2020.

59.     Bank records obtained via grand jury subpoena also show that, between April 2020 and December 2020, GERALDES' company Drip received approximately $6.8 million from a Panda bank account that received proceeds of fraud.

### CMS Data

60.     Based on CMS data obtained during the course of this investigation, between April 2020 and December 2020, GERALDES and his co-conspirators caused the Laboratories to submit, and cause the submission of, an amount in excess of approximately $90 million in false and fraudulent claims to Medicare for genetic tests that were obtained through kickbacks and bribes, medically unnecessary, ineligible for reimbursement, or not provided as represented.   Medicare paid the Laboratories approximately in excess of $61 million for these claims.

61.     That same CMS data reveals that, between approximately April 2020 and December 2020, NP1 was responsible for authorizing approximately $65 million, or roughly 72%, of MP3 and Amerihealth's billings in that period.   CMS billing data suggests he/she approved testing at MP3 and Amerihealth for approximately 5,000 different beneficiaries in just seven months.   Based on this affiant's training and experience, legitimate laboratories receive referrals from numerous different medical professionals.    In contrast, in this affiant's training and experience, data showing that one medical professional refers a substantial percentage of patients to a laboratory is indicative of an illegal kickback arrangement.

62.     CMS billing data for NP1 shows he/she personally billed for over 5,400 in person 45-minute office visits between approximately April and October 2020, in the midst of the Covid-19 pandemic.   NP1 would have had to work approximately 18 hours a day, 30 days each month, without breaks, in order to accomplish this.   This would not include the additional time NP1 purportedly spent on the hundreds of other services and office visits he/she also billed to Medicare. In this affiant's training and experience, it would have been difficult or impossible for NP1 to conduct such a number of bona fide medical consultations in a single day.

### The Defendant's False Statements

63.     In or around December 2020, Panda, GERALDES and Individual 3, through their counsel, approached the government to report potential fraud at Panda. Based upon my training and experience, entities and individuals that self-report in this way are often seeking to avoid prosecution or to receive leniency from the government as a result of their cooperation.

64.     During subsequent discussions with law enforcement, Individual 3 and Panda's counsel reported that GERALDES and others had discovered compliance and fraud concerns at the company in or around October 2020, prompting Individual 1 to leave the company and resulting in a compliance audit at Panda around that same time.

65.     On December 23, 2020, the government sent an email to GERALDES' counsel asking them to preserve any messages in the texting application Slack, which was used by company personnel to communicate about business matters between approximately August 2020 and December 2020.

66.     In or around August 2021, law enforcement interviewed GERALDES pursuant to a proffer agreement. The proffer agreement provides that its protections are void during a subsequent prosecution for, inter alia, false statements made during the proffer. During this interview, GERALDES stated that he had not deliberately deleted any Slack messages, nor discussed the deletion of any Slack messages with any other Panda personnel.

67.     However, texts between GERALDES and others, which were voluntarily provided to law enforcement by Cooperating Witness 1 as part of her/his cooperation, show that GERALDES made false statements to law enforcement about whether or not he discussed deleting these messages. On or around November 24, 2020, after Panda began investigating compliance concerns at the company, GERALDES wrote to others at Panda: "need to delete that from Slack.

I think we should do an audit of Slack and delete everything that doesn't make sense having there." Individual 2 responded "Okay. Let's just delete all Messages[sic] [s]o we don't over look[sic]." GERALDES responded "sure in all private chats although it looks odd if it's all gone." During interviews with law enforcement, Cooperating Witness 1 stated that although he was not active on Slack and was not certain what specific messages GERALDES and Individual 2 were referencing in this discussion, he believed the only reason to delete any messages on Slack would be to destroy potentially problematic evidence of the above described scheme to defraud.

### The Defendant's Efforts to Flee

68.     GERALDES has known that he and his conduct related to Panda have been under investigation since December 2020.  On August 5, 2021, the government advised GERALDES' counsel that it believed that GERALDES had made false statements to law enforcement, and that this could result in charges.

69.     On or about August 17, 2021, law enforcement was notified that GERALDES was planning to fly to Portugal, his country of citizenship, in an apparent attempt to flee before charges could be filed against him.

### CONCLUSION

70.     Based upon the foregoing, I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from on or about March 2019 and continuing through on or around March 2021, in Palm Beach, Broward, and Miami-Dade Counties, in the Southern District of Florida, and elsewhere, GERALDES, together with other owners of Panda, Michael Stein, and others known and unknown, knowingly and willfully, that is, with the intent to further the objects of the conspiracy, combine, conspire, confederate, and agree with others known and unknown, to defraud the United States by impairing, impeding, obstructing, and defeating through

deceitful and dishonest means, the lawful government functions of the United States government and any of its departments or agencies, namely, HHS in its administration and oversight of the Medicare program, and to commit certain offenses against the United States, that is, to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by offering and paying any remuneration, including kickbacks and bribes, directly and indirectly, overtly and covertly, in cash and in kind, including by check and wire transfer, to a person to induce such person to purchase, lease, order, and arrange for and recommend purchasing, leasing, and ordering of any good, facility, service, and item, for which payment may be made in whole and in part by a Federal health care program, that is, Medicare. I further submit that there is probable cause to believe that, in or around August 2021, in Miami-Dade County, in the Southern District of Florida, GERALDES made a materially false, fictitious, or fraudulent representation in a matter within the jurisdiction of the executive branch of the government of the United States, in violation of Title 18, United States Code, Section 1001.

FURTHER AFFIANT SAYETH NAUGHT.

VICTORIA BUONO
Special Agent
HHS-OIG

Attested to by the applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 via Telephone this 18 day of August, 2021.

HONORABLE JACQUELINE BECERRA
UNITED STATES MAGISTRATE JUDGE

22